IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

GLOBAL TEL\*LINK CORP., *d/b/a* )
VIAPATH TECHNOLOGIES, )
    **Plaintiff / Counter-Defendant,** )
)
v. )
)
JACS SOLUTIONS INC., )     **Case No. 1:23-cv-179**
    **Defendant / Counterclaimant,** )
)
v. )
)
RATTANA CHHAY, )
    **Counter-Defendant.** )

## <u>MEMORANDUM OPINION</u>

In this commercial dispute, Plaintiff–Counter-Defendant Global Tel\*Link Corporation, *d/b/a* ViaPath Technologies (from here on, "ViaPath"), sued Defendant–Counterclaimant JACS Solutions Inc. ("JACS") on five claims arising from alleged breaches of a contract that ViaPath and JACS executed in December 2018. JACS moved to dismiss ViaPath's complaint, and on July 13, 2023, JACS' motion was denied. After that denial, JACS brought ten counterclaims against ViaPath and Rattana Chhay, a former JACS executive.[1] For ease of reference, those ten claims are listed and described briefly below:

**Count I:**    Antitrust violation under the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 *et seq.* (against ViaPath).

**Count II:**    Misappropriation of trade secrets pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* (against both ViaPath and Chhay).

**Count III:**    Misappropriation of trade secrets pursuant to the Virginia Uniform Trade Se-

---

1    Chhay never responded to the counterclaims against him. Accordingly, on October 27, 2023, the Clerk of Court entered Chhay's default on the docket. (Dkt. 130). On December 8, 2023, JACS moved for default judgment against Chhay, and JACS' motion is currently pending. (Dkt. 216).

crets Act, Va. Code § 59.1-336 *et seq.* (against both ViaPath and Chhay).

**Count IV:** Breach of contract (against ViaPath).

**Count V:** Breach of contract (against Chhay).

**Count VI:** Tortious interference with contractual relations, *i.e.*, inducing Chhay's breach in Count V (against ViaPath).

**Count VII:** Tortious interference with contractual relations, *i.e.*, inducing ViaPath's breach in Count IV (against Chhay).

**Count VIII:** Common law conspiracy to interfere with contractual relations, *i.e.*, conspiring with Chhay to commit Count VII (against ViaPath).

**Count IX:** Common law conspiracy to interfere with contractual relations, *i.e.*, conspiring with ViaPath to commit Count VI (against Chhay).

**Count X:** Statutory conspiracy under the Virginia Business Conspiracy Act (the "VBCA"), Va. Code § 18.2-499 *et seq.*, *i.e.*, conspiring to cause ViaPath's tortious interference in Count VI (against both ViaPath and Chhay).

ViaPath has now moved to dismiss four of JACS' counterclaims. (Dkt. 100). Specifically, ViaPath's motion requests dismissal of JACS' Counts I, VI, VIII, and X, namely, JACS' antitrust, tortious interference, and conspiracy claims against ViaPath. ViaPath's motion has been fully briefed and was argued orally on November 16, 2023. *See* Hr'g Tr. (Dkt. 172). Accordingly, ViaPath's motion is ripe for disposition. For the reasons that follow, ViaPath's motion must be granted in part and denied in part. Specifically, the motion must be granted with respect to Counts I, VIII, and X of JACS' counterclaims—JACS' antitrust and conspiracy counterclaims— and denied with respect to Count VI—JACS' tortious interference counterclaim.

## I.

The essential facts of this case have been described in prior orders. *See generally Glob. Tel\*Link Corp. v. JACS Sols. Inc.* (order dated July 28, 2023) (Dkt. 53-1).[2] Those facts not stated

---

2   Because this case involves the parties' confidential business information, many of the documents at issue—including the order on JACS' motion to dismiss the complaint—were origi-

elsewhere on the docket are taken from JACS' counterclaims and assumed true for purposes of this Memorandum Opinion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). These relevant facts may be summarized as follows:

- ViaPath is an Idaho corporation with its principal place of business in Fairfax County, Virginia. ViaPath provides communication services, including specially developed wireless tablet computers, for use by persons incarcerated in prisons and jails. JACS' Amended Counterclaims ¶¶ 2, 10 ("AC") (Dkt. 79 at 21).

- JACS is a Delaware corporation with a principal place of business in Anne Arundel County, Maryland. JACS develops custom "enterprise grade smart devices," including tablet computers. AC ¶¶ 1, 11.

- In 2013, ViaPath and JACS embarked on a joint venture to develop a tablet computer for use in prisons and jails. ViaPath set out objectives for the project, and JACS designed a device to meet those objectives. Four years later, in October 2017, JACS proposed a design for a tablet, and ViaPath approved that design. AC ¶¶ 12–13.

- In December 2018, in furtherance of their joint venture, ViaPath and JACS executed a Manufacturing and Services Agreement (the "MSA"), which set out terms on which JACS would manufacture the prison tablet design. *Id.* at ¶ 14; *see generally* MSA (Dkt. 85-1.

- The MSA gave ViaPath a license to use source code developed by JACS—that is, JACS' intellectual property—during the term of the MSA. *See* MSA § 3.6. The MSA also gave ViaPath an option to purchase a permanent, unrestricted license to use JACS' source code. *See* MSA § 3.7 (the "Option-to-Convert Clause"); *id.* at Ex. 4, § II (specifying the price of the license).

- The MSA also contains a confidentiality clause that prohibited JACS and ViaPath from disclosing any information furnished from one to the other that was marked as, or reasonably identifiable or understood to be, confidential, unless the information was independently developed, publicly known, or disclosed without the expectation of confidentiality. *See* MSA § 12.1 (the "Confidentiality Clause").

- Rattana Chhay is a natural person who resides in Florida. Until December 2021, Chhay was an employee, officer, and part-owner of JACS. AC ¶ 3.

---

nally filed under seal. To ensure that this Memorandum Opinion is available to the public in full, care has been taken to ensure that all citations to docket entries point to redacted documents filed on the public docket pursuant to Local Civil Rule 5. On this point, gratitude is owed to Magistrate Judge William E. Fitzpatrick, whose prompt and able resolution of the parties' sealing disputes has allowed public issuance of this opinion. *See, e.g.*, *Glob. Tel*Link Corp. v. JACS Sols. Inc.*, No. 1:23-CV-179, 2023 WL 6192738 (E.D. Va. Sept. 8, 2023).

- JACS hired Chhay as a Chief Engineer in January 2016. Chhay was promoted to Vice President of Operations in December 2020. AC ¶¶ 29–30.

- Soon after his promotion, Chhay entered into a Noncompetition, Nonsolicitation, Confidentiality, and Nondisclosure Agreement with JACS. AC ¶ 31; *see id.* at Ex. A (the "NDA") (Dkt. 79-2 at 2). The NDA required Chhay to keep JACS' secrets after ending his employment with JACS and forbade Chhay from abusing JACS' secrets for Chhay's own gain. NDA § 3. The confidentiality terms of the NDA have no end date and survive the rest of the agreement. AC ¶ 37; NDA § 10.

- On November 29, 2021, Chhay and JACS executed a separation agreement. AC ¶ 38; *id.* at Ex. B (the "SA") (Dkt. 79-2 at 9). The SA reaffirmed Chhay's commitment to the NDA and provided that Chhay's last day of work at JACS would be December 10, 2021. AC ¶ 38.

- On May 9, 2022, Chhay started a new company, Zece Tech Enterprise LLC. AC ¶ 40.

- Between Chhay's last day of work at JACS and his incorporation of Zece, ViaPath did not issue a single purchase order to JACS. AC ¶ 43. ViaPath's subsequent orders from JACS were modest; ViaPath placed only one order a month in a quantity smaller than what ViaPath had purchased before Chhay's departure. *Id.* at ¶¶ 44–45.

- In June 2023, JACS was contacted by a whistleblower—on information and belief, a ViaPath insider—who informed JACS of a long-running professional relationship between ViaPath and Chhay (the "ViaPath-Chhay Venture"). AC ¶¶ 46–47. Specifically, since June 2022, Chhay and ViaPath had collaborated to design and produce a new tablet computer that would replace the product JACS had designed. *Id.* at ¶ 46(a). The whistleblower suggested, and JACS immediately suspected, that ViaPath and Chhay's secret joint venture violated the Confidentiality Clause of the MSA and the terms of Chhay's NDA. *Id.* at ¶ 46(b), (f).

- Shortly after being contacted by the whistleblower, JACS reviewed Chhay's JACS-provided e-mail account and discovered communications showing that "between January 19, 2023, and May 4, 2023, ViaPath's Hardware Engineer was corresponding with Chhay about testing hardware equipment." AC ¶ 48.

- JACS pleads that the ViaPath-Chhay Venture must have made use of JACS' trade secrets because Chhay, who had no tablet manufacturing experience outside of his work for JACS, would not have otherwise been able to bring a tablet computer close to production in less than a year. AC ¶¶ 52, 54, 56.

ViaPath's motion seeks to dismiss Counts I, VI, VIII, and X of JACS' counterclaims. In other words, ViaPath's motion does not seek threshold dismissal of JACS' federal and state trade secret misappropriation claims (Counts II and III) or JACS' breach of contract claim (Count V).

Instead, ViaPath argues (i) that JACS' antitrust claims should be dismissed for lack of antitrust standing and failure to allege plausibly that the MSA's exclusivity provision harmed competition, and (ii) that JACS' state-law tortious interference, common law conspiracy, and VBCA claims should be dismissed for failure to allege plausibly various elements of those business torts.

## II.

ViaPath's motion is brought pursuant to Rule 12(b)(6), Fed. R. Civ. P., and invokes the familiar standard that applies to a motion to dismiss. Because a Rule 12(b)(6) motion tests only a counterclaim's legal sufficiency, a court "must accept as true all well-pleaded allegations" in the counterclaim. *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021) (internal citation omitted). Despite a court's duty to "view the facts alleged in the light most favorable" to the counterclaimant, a court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In other words, to survive a motion to dismiss, "a complaint (or counterclaim, as is the case here) must contain sufficient facts to state a claim that is 'plausible on its face.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). JACS must allege facts sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Finally, while an affirmative defense may in some circumstances be adjudicated on a motion to dismiss, doing so is permitted only when "the face of the [pleading] includes all necessary facts for the defense to prevail." *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850–51 (4th Cir. 2016).

## III.

Analysis of ViaPath's motion to dismiss JACS' antitrust counterclaim properly begins with an understanding of the alleged claim. JACS' antitrust counterclaim alleges that the MSA's exclusive dealing provision is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1, as an unreasonable restraint on trade.[3] As a result of this substantive violation, JACS pleads that it may recover (i) treble damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; (ii) injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; and (iii) a declaration, pursuant to 28 U.S.C. § 2201, that the exclusive dealing provision is unenforceable, anticompetitive, and unlawful. AC ¶ 109; *id.* at Prayer for Relief ¶¶ (i), (k), (l) (Dkt. 79 at 61–62).

ViaPath, in turn, alleges that JACS' antitrust counterclaim should be dismissed in its entirety, either because JACS negotiated and executed the MSA or because JACS has not pled the requisite antitrust injury.[4] ViaPath's arguments are addressed below. Put succinctly, JACS falls far short of alleging antitrust standing, not because it is party to the contract at issue, but because JACS does not allege the sort of injury that the antitrust laws require and were meant to prevent. For this reason, JACS' claims for treble damages and an injunction must be dismissed. Assuming

---

3    In the alternative, JACS alleges that the MSA's exclusivity provision violates Section 3 of the Clayton Act, 15 U.S.C. § 14, which prohibits certain exclusive dealing contracts independently of the Sherman Act. AC ¶¶ 107, 109. But JACS now acknowledges that Section 3 applies only to contracts that restrict the activity of purchasers (like ViaPath), not sellers (like JACS). 15 U.S.C. § 14; *see McElhenney Co. v. W. Auto Supply Co.*, 269 F.2d 332, 337 (4th Cir. 1959). Therefore, JACS correctly concedes that ViaPath is not liable under Section 3. JACS Mem. at 15 (Dkt. 108).

4    ViaPath also argues (i) that JACS lacks antitrust standing because it is not a sufficiently direct victim of the alleged antitrust harm; (ii) that JACS does not plausibly plead that the MSA has substantial anticompetitive effects; and (iii) that JACS does not plausibly plead harm in the relevant market. Because resolving these three arguments is not necessary to resolve ViaPath's motion to dismiss JACS' antitrust counterclaim, the arguments in this footnote need not be addressed.

without deciding that JACS does not need an antitrust injury to sue for a declaratory judgment, JACS' declaratory claim is still inappropriately brought and will be dismissed.

### A.

ViaPath first argues that JACS is barred from bringing suit because JACS "negotiated and executed the contract at issue." ViaPath Mem. at 6 (Dkt. 101). ViaPath's argument is misplaced. What ViaPath incorrectly describes as an aspect of antitrust standing is in truth the affirmative defense of *in pari delicto*—a traditional principle whereby "a plaintiff who has participated in wrongdoing may not recover damages from the wrongdoing." *In Pari Delicto Doctrine*, Black's Law Dictionary (11th ed. 2019); *see also infra* § III.B. (describing the doctrine of antitrust standing). Because *in pari delicto* is an affirmative defense, it is not ripe for adjudication at this time.

ViaPath claims that antitrust claims brought by "a party to the illegal agreement" must be dismissed, but binding precedent does not support ViaPath's categorical rule. ViaPath Mem. at 6 (quoting *Pa. Water & Power Co. v. Consol. Elec. Light & Power Co. of Balt.* (*Penn Water*), 209 F.2d 131, 133 (4th Cir. 1953)).[5] ViaPath's lead case, *Penn Water*, did apply *in pari delicto* to hold that no antitrust action could lie where "the plaintiff and the defendant [are] parties to the same illegal conspiracy or agreement on which the suit [is] based." 209 F.2d at 133. However, that precedent has been overruled. In *Perma Life Mufflers, Inc. v. International Parts Corp.*, the Supreme Court refused "to undermine the antitrust acts by denying recovery to injured parties merely because they have participated ... in [an] allegedly illegal scheme." 392 U.S. 134, 139 (1968). In *Perma Life*, the Supreme Court held that "the doctrine of *in pari delicto*, with its com-

---

5   ViaPath also cites *Kelly v. Kosuga*, 358 U.S. 516 (1959), for the proposition that courts are "appropriately hostile" to antitrust claims brought to avoid contractual obligations. ViaPath Mem. at 6. *Kelly*, however, concerned only situations where illegality under the Sherman Act is asserted as an affirmative defense in a contract suit. 358 U.S. at 518. JACS' counterclaims do no such thing. *See infra* § III.D. Thus, *Kelly* is inapposite.

plex scope, contents, and effects, is not to be recognized as a defense to an antitrust claim." *Id.* at 140. In other words, *Penn Water*'s rule is no longer good law.

However, as the Fourth Circuit has recognized, *Perma Life*'s apparent rejection of the *in pari delicto* defense cannot be taken out of context and interpreted to foreclose the defense entirely. *Perma Life* expressly declined to address whether "truly complete involvement and participation in a monopolistic scheme" could foreclose recovery under the antitrust laws. 392 U.S. at 140. Three years later, the Fourth Circuit took up the question the Supreme Court reserved in *Perma Life*. In *Columbia Nitrogen Corp. v. Royster Co.*, the Fourth Circuit read *Perma Life*'s majority opinion and its concurring opinions as an integrated whole and concluded that those opinions, considered together, "teach that when [(i)] parties of substantially equal economic strength [(ii)] mutually participate in the formulation and execution of the [illegal] scheme and [(iii)] bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other." 451 F.2d 3, 15–16 (4th Cir. 1971).[6]

In its reply brief, ViaPath concedes, as it must, that *in pari delicto* is an affirmative defense that is available to defendants on the terms set out in *Columbia Nitrogen*. ViaPath Reply at 4 n.2 (Dkt. 110); *see also Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 387 & n.6 (4th Cir. 1982) (discussing "the affirmative defense of *in pari delicto*."). Because *in pari delicto* is an affirmative defense, it is antitrust defendants, not antitrust plaintiffs, that must ultimately satisfy the *Columbia Nitrogen* test. *Burlington*, 690 F.2d at 387. Indeed, ViaPath cites no cases that suggest that *in pari delicto* can be adjudicated on a threshold motion to dismiss.[7] This is so because

---

6   An early commentator correctly predicted that *in pari delicto* would survive the *Perma Life* decision in a more limited form. *See* T.S. Ellis, III, *In Defense of In Pari Delicto*, 56 ABA J. 346, 348 (1970).

7   In its reply brief, ViaPath relies on an unpublished case from this District that found a plaintiff to be *in pari delicto* with an antitrust defendant. ViaPath Reply at 4–5 (citing and quoting

adjudication of an affirmative defense is proper on a motion to dismiss only if "all necessary facts for the defense to prevail" are apparent on the face of the relevant pleading. *Leichling*, 842 F.3d at 850–51. ViaPath does not and cannot argue that JACS' antitrust counterclaim, on its face, shows that the *Columbia Nitrogen* test applies here. Accordingly, ViaPath's invocation of *in pari delicto* is premature and does not justify dismissal of JACS' antitrust counterclaim.

## B.

ViaPath next argues that JACS' claim for treble damages must fail for lack of what is colloquially called "antitrust standing." *See Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310–11 (4th Cir. 2007).[8] In ViaPath's view, JACS lacks antitrust standing because JACS' injuries "are not the type that the antitrust laws were intended to prevent." ViaPath Mem. at 6. Close attention reveals that ViaPath is correct; JACS may not be awarded pecuniary relief because JACS has not suffered an antitrust injury—an essential component of antitrust standing.[9]

Assessment of ViaPath's antitrust standing argument appropriately begins with a review of the antitrust injury requirement. When an antitrust plaintiff sues for treble damages, the plaintiff's cause of action is provided by Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15. Section 4's text authorizes suit by "any person ... injured in his business or property by

---

*Net Realty Holding Tr. v. Franconia Props., Inc.*, No. 82-CV-318, 1983 WL 1786 (E.D. Va. Jan. 20, 1983)). But *Net Realty* applied *in pari delicto* only after trial. *Id.*, 1983 WL 1786, at *1. The case is neither analogous nor persuasive where, as here, a party seeks to adjudicate *in pari delicto* on a motion to dismiss.

8   To be clear, so-called "antitrust standing" is "somewhat different from ... standing as a constitutional doctrine." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 535 n.31 (1983). ViaPath does not contend that JACS lacks Article III standing; rather, ViaPath argues that JACS is not "a proper party to bring a private antitrust action." *Id.*

9   Because JACS' antitrust counterclaim must be dismissed for lack of antitrust injury, this Memorandum Opinion need not reach ViaPath's argument concerning the directness of JACS' injury, which goes to the second, proximate cause–like, component of antitrust standing. *See AGC*, 459 U.S. at 535, 540; *Novell, Inc.*, 505 F.3d at 311.

reason of anything forbidden in the antitrust laws." *Id.* at § 15(a). But the Supreme Court has long held that "the broad language of [Section] 4" cannot be read so literally that it would permit "'a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters (AGC)*, 459 U.S. 519, 534–35 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). To limit the otherwise-limitless reach of Section 4, the Supreme Court has read Section 4 to contain implied limitations known collectively as the doctrine of "antitrust standing." As relevant here, the Supreme Court has held that a plaintiff has not been injured "'by reason of anything forbidden in the antitrust laws'" if the plaintiff's injury "did not occur 'by reason of' that which made the [alleged acts] unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting 15 U.S.C. § 15(a)).[10] In other words, an antitrust plaintiff must plead an "antitrust injury"—*i.e.*, an injury caused by the antitrust violation itself, not just an injury in fact—to sue for treble damages pursuant to Section 4. *See Atl. Richfield Co. v. USA Petroleum Co. (ARCO)*, 495 U.S. 328, 334 (1990) (summarizing and reaffirming *Brunswick* and its progeny).

As the Supreme Court declared in *Brunswick*, an antitrust injury must "flow[] from that which makes [the alleged violation] unlawful." 429 U.S. at 489. And, as the Fourth Circuit has recently made clear, caution about antitrust injury is especially important when cases "involve both contractual and antitrust claims," since it is easy for a claim of breach—or simply contractual sour grapes—to "'masquerad[e] as a candidate for treble damages.'" *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021) (quoting *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995)). Thus, as the Fourth Circuit concluded in *Steves*, where a contract is

---

10 *Brunswick*, in essence, applies the "mischief rule," a traditional canon of statutory interpretation that favors choosing "a broader or narrower scope" for a statutory term by considering "the problem to which the statute was addressed"—a particularly important aspect of the statute's context. Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968–76 (2021).

alleged to be illegal, the best way of drawing the distinction between contract injury and antitrust injury is by asking whether an antitrust plaintiff "would have suffered 'an identical loss'" if the contract were not unlawful. *Id.* (quoting *Brunswick*, 429 U.S. at 487). In other words, *Steves* and *Brunswick* require a but-for test.

The antitrust injury showing that JACS is required to make is well illustrated by the Fourth Circuit's decision in *Steves*. In that case, plaintiff Steves and Sons, Inc., a door manufacturer, sued defendant JELD-WEN, Inc., which supplied the plaintiff with "doorskins."[11] *Steves*, 988 F.3d at 699. In 2012, after JELD-WEN merged with a competitor, "reduc[ing] the number of American doorskin manufacturers from three to two," JELD-WEN began steadily to ratchet up the prices it charged Steves. *Id.* at 700–01. Steves then sued, alleging both that JELD-WEN breached the parties' long-term supply agreement and that JELD-WEN's 2012 merger was illegal under Section 7 of the Clayton Act, 15 U.S.C. § 18. *Id.* at 702–03. On appeal, JELD-WEN argued, in relevant part, that Steves lacked an antitrust injury. *Id.* at 709. In JELD-WEN's view, "Steves's injury was a purely contractual one" because Steves's only injury was that it "paid more and got less" than the parties' contract provided. *Id.* The Fourth Circuit disagreed, concluding that Steves's antitrust injury was not based on its contract damages *simpliciter* because JELD-WEN's merger "hindered Steves's access to other doorskin suppliers, which the [contract] would have otherwise protected." *Id.* at 711. Thus, the Fourth Circuit held, JELD-WEN's anticompetitive conduct hindered Steves's ability to mitigate its contract damages, making "the loss that Steves suffered ... greater than—not 'identical' to—what it would have suffered from

---

11 As the Fourth Circuit explained, most doors on the American market are "'molded doors,' which are made by placing a wood frame and a solid or hollow core between two 'doorskins' that make up the front and back of the finished door." *Steves*, 988 F.3d at 699.

breaches of the [contract] absent the merger." *Id.* (citation omitted) (quoting *Brunswick*, 429 U.S. at 487).

Unlike the antitrust plaintiff in *Steves*, JACS has not pleaded facts showing that its injury is more than contractual. JACS pleads only that the challenged exclusive dealing provision has "hindered JACS' ability to compete vigorously for customers in the market." AC ¶ 101. JACS attempts to bolster its claims by recharacterizing its injury, but these attempts fail. For instance, JACS pleads that, because ViaPath has "remov[ed] JACS' capacity from the market," correctional tablet prices have increased, depriving "correctional communication services companies" (*i.e.*, ViaPath's competitors) and "correctional institutions and inmates" (*i.e.*, ViaPath's direct and indirect customers) of "the benefits of tablet competition." AC ¶¶ 101–02. Yet this injury is plainly not suffered by JACS itself; instead, as JACS itself concedes and pleads, the harm to JACS is that it is bound by the exclusive dealing contract at issue. That is a contract injury, not an antitrust injury. No reference to that restriction's downstream market effects can change the injury to JACS.[12]

That JACS "would have suffered an identical loss" if the exclusive dealing contract JACS challenges were lawful is further shown by considering a more precise articulation of what

---

12 JACS also argues that JACS is harmed by ViaPath's conduct in this very lawsuit. For instance, JACS claims that it is injured not by the exclusive dealing contract itself but by ViaPath's "expansive reading of the contractual terms of the MSA" in this litigation, a reading JACS opposes. JACS Mem. at 5–6; *see* JACS Suppl. Mem. at 1–2 (Dkt. 205). JACS also asserts that ViaPath seeks to enforce the parties' exclusive dealing contract "to exclude JACS from selling to firms which may compete with ViaPath." JACS Mem. at 6.

JACS' arguments are misdirected where, as here, the only illegality pleaded is under *Section 1* of the Sherman Act. As binding precedent makes clear, "restraint of trade without a conspiracy or combination is not unlawful under [Section] 1." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 n.13 (1984). ViaPath's allegedly aggressive and anticompetitive interpretation of the MSA is "[t]he conduct of a single firm" and therefore "is governed by [Section] 2 alone." *Id.* at 767. ViaPath's "expansive reading of the contractual terms of the MSA" is unilateral activity that provides no basis for JACS to state a Section 1 claim. JACS Suppl. Mem. at 2.

makes an exclusive dealing contract unlawful. *Steves*, 988 F.3d at 710 (internal quotation omitted). Exclusive dealing contracts are not and have never been illegal *per se*. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333 (1961). Rather, exclusive dealing arrangements violate Section 1 of the Sherman Act "only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 44–45 (1984) (O'Connor, J., concurring in the judgment) (citing *Standard Oil Co. v. United States*, 337 U.S. 293 (1949)); *see also Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987) (same). This is so because, absent anti-competitive market effects, an exclusive dealing contract "may well be of economic advantage to buyers as well as to sellers." *Tampa Elec.*, 365 U.S. at 334 (quoting *Standard Oil*, 337 U.S. at 306). Put another way, an exclusive dealing contract is unlawful only when it creates an anticompetitive chilling effect—a deterrent to competition so powerful that the contract "significantly limit[s]" competing buyers' or sellers' ability "to enter into or remain in" the market. *Chuck's Feed & Seed*, 810 F.2d at 1293 (quoting *Tampa Elec.*, 365 U.S. at 327–28).

These teachings, applied here, persuasively indicate that JACS' alleged injury—an inability to compete for customers on the open market—is insufficient because it is not an injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Steves*, 988 F.3d at 710 (quoting *Novell*, 505 F.3d at 311). *Brunswick* and *Steves* require a finding that JACS has suffered no antitrust injury if JACS' loss would have been identical absent the MSA's alleged anticompetitive effect on the market. JACS' alleged injury is that it cannot "compete vigorously for customers" on the open market and thus has been "deprived of sales it otherwise could have made." AC ¶ 101; JACS Suppl. Mem. at 4 (Dkt. 205). JACS alleges that this injury, in turn, "caused injury to the entire correctional tablet market." JACS Suppl. Mem. at

4. If that is true, the correctional tablet market suffered an antitrust injury. But JACS, critically, does not allege that JACS' injury flows from the alleged harm to the market. *See Brunswick*, 429 U.S. at 489. The injury to JACS itself, *i.e.*, JACS' inability to compete for customers, is the alleged cause of the harm to the market, not an alleged effect. Like the respondents in *Brunswick*, JACS "would have suffered the identical 'loss' but no compensable injury" if the exclusive dealing contract had no anticompetitive effect at all. 429 U.S. at 487. Put another way, if the MSA's exclusive dealing provision fostered competition rather than discouraging it, JACS would be deprived of more sales as a result, and JACS would therefore suffer a greater injury. The Clayton Act does not require that perverse result. Because JACS' injury is not dependent on the existence of an antitrust violation, JACS' injury does not "flow[] from that which makes the [MSA] unlawful." *Brunswick*, 489 U.S. at 489. Therefore, JACS pleads no antitrust injury and has no antitrust standing.

This conclusion is supported by analogous out-of-circuit caselaw. In *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607 (6th Cir. 2001), the plaintiff's claims arose from the termination of a distributorship contract the plaintiff had with the defendant. One of the plaintiff's claims asserted that the exclusivity provision of the distributorship contract was unlawful under Section 3 of the Clayton Act, 15 U.S.C. § 14. The Sixth Circuit rejected the plaintiff's antitrust claim because the plaintiff's only injury was contractual in nature. In the Sixth Circuit's words, "the injury to [the plaintiff] flow[ed] [entirely] from the termination; the antitrust violation was not a necessary predicate of the injury." *Watkins*, 254 F.3d at 615. *Watkins*' reasoning applies with equal force here. JACS' injury is no different in kind from the injury suffered by any party to any exclusivity clause. JACS complains that it "is excluded from competing in the market [and] is deprived of sales it otherwise could have made." JACS Suppl. Mem. at 4. But each and every ex-

14

clusivity clause entered by a supplier prevents that supplier from "competing in the market" and making sales the supplier "otherwise could have made." *Id.* Just like the plaintiff in *Watkins*, the illegality of the exclusive deal "[is] not a necessary predicate" of JACS' injury. 254 F.3d at 615. *Watkins* thus confirms that JACS has failed to plead an antitrust injury.

JACS resists this reasoning with caselaw of its own, but JACS' caselaw cannot carry the weight that JACS would have it bear. *See* JACS Suppl. Mem. at 2–4 (discussing *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443 (E.D. Va. 2009)). In *Kolon*, counterclaimant Kolon Industries alleged that counter-defendant DuPont monopolized and attempted to monopolize the market for aramid fiber, a class of high-strength material used to manufacture Kevlar fabric. 688 F. Supp. 2d at 447–48, 455. Kolon sought to develop a competitor to Kevlar, and DuPont's complaint alleged that Kolon solicited former DuPont employees and pressured them to divulge DuPont's secret Kevlar-manufacturing methods. *Id.* at 448. JACS asserts that its "allegations mirror the allegations found sufficient ... in *Kolon*," where, in JACS' telling, Kolon's counterclaim alleged that DuPont anticompetitively relied on "long-term exclusive supply contracts in order to hinder Kolon's ability to compete in the market." JACS Suppl. Mem. at 2, 3.

However, upon close inspection, JACS' analogy to *Kolon* falls apart. In that case, Kolon and DuPont—unlike ViaPath and JACS—were never in contractual privity. Kolon was a DuPont competitor, not a DuPont supplier, and the "long-term supply agreements" challenged by Kolon were agreements between DuPont and its non-party clients. *Kolon*, 688 F. Supp. 2d at 458. Furthermore, Kolon brought its counterclaim pursuant to Section 2 of the Sherman Act, which prohibits unilateral attempted monopolization. *See supra* note 12. Unlike JACS, Kolon did not allege that the supply agreements at issue were unlawful restraints in themselves. Rather, Kolon alleged that the existence of the supply agreements was probative evidence of DuPont's attempt-

15

ed monopolization of the aramid market. Thus, in *Kolon*, antitrust standing was straightforward. Had DuPont's actions been lawful, DuPont would not be a monopolist, and Kolon would have been able to enter the market for aramid fiber. *See* 688 F. Supp. 2d at 461. That simple theory of antitrust injury is absent from this case because JACS does not allege that ViaPath's actions have kept *JACS* out of a new market. In short, because Kolon was a competitor and JACS is a supplier, *Kolon* is not analogous and does not alter the conclusion reached here.

To summarize, precedent and common sense confirm that JACS has not suffered an "injury of the type the antitrust laws were intended to prevent." *ARCO*, 495 U.S. at 334 (quoting *Brunswick*, 429 U.S. at 489). For that reason, JACS has not been "injured … by reason of anything forbidden by the antitrust laws" within the meaning of Section 4 of the Clayton Act. 15 U.S.C. § 15(a). Accordingly, JACS' treble damages claim must be dismissed.

## C.

Although the foregoing analysis relies on cases construing Section 4 of the Clayton Act, which authorizes private actions for treble damages, the same caselaw points persuasively to the conclusion that JACS lacks statutory authorization to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Section 16 creates a private cause of action for injunctions "against threatened loss or damage by a violation of the antitrust laws." *Id.* Importantly, the Supreme Court has interpreted Section 16's text with its Section 4 caselaw in mind. This is because, as the Supreme Court has recognized, Sections 4 and 16 use very similar language and are thus "best understood as providing complementary remedies for a single set of injuries." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112–13 (1986). The Supreme Court therefore reasoned that "[i]t would be anomalous … to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if

the injury actually occurred." *Id.* at 112. In other words, to be entitled to injunctive relief under

Section 16, a plaintiff "must allege threatened loss or damage 'of the type the antitrust laws were

designed to prevent and that flows from that which makes [the defendant's] acts unlawful.'" *Id.*

at 113 (quoting *Brunswick*, 429 U.S. at 489).

 In summary, a private party seeking an injunction under Section 16 of the Clayton Act

must show, at minimum, an antitrust injury. *Cargill*, and the appellate decisions to have applied

it, are unambiguous on that point. *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l,

Inc.*, 602 F.3d 237, 248 (3d Cir. 2010); *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,

140 F.3d 1228, 1233 (9th Cir. 1998); *Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 249

(5th Cir. 1992); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 257 (2d Cir. 1989). For

reasons already discussed, JACS lacks an antitrust injury. *See supra* § III.B. JACS thus fails to

state a claim on which a Clayton Act injunction may be granted.

**D.**

 In the alternative to its demands for treble damages and an injunction, JACS' counter-

claims request a declaration that the MSA's exclusive dealing provision is illegal and unenforce-

able. *See* 28 U.S.C. § 2201. JACS argues that "[a] contracting party concerned about an agree-

ment's legality may seek a declaratory judgment even if it lacks standing to challenge the possi-

ble violation." JACS Mem. at 7 (Dkt. 108). But even assuming that JACS need not show anti-

trust standing to bring a declaratory judgment claim, it is still appropriate to dismiss JACS' de-

claratory judgment counterclaim because JACS' declaratory judgment counterclaim will not

serve a useful purpose in settling the parties' legal relations.

 It is well settled that the Declaratory Judgment Act, which provides that a court "*may* de-

clare the rights of the parties," creates a discretionary remedy which a court is under no obliga-

17

tion to issue. 28 U.S.C. § 2201(a) (emphasis added). As the Supreme Court has long held, the Declaratory Judgment Act "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952). Indeed, the courts' "discretion in deciding whether to declare the rights of litigants" is "substantial" and essentially "unique." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Supreme Court has said little to guide courts' wide discretion to grant declaratory relief, holding only, in cryptic terms, that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness." *Id.* at 287 (quoting *Wycoff Co.*, 344 U.S. at 243). Put another way, if a district court finds, "in the sound exercise of its judgment, ... that a declaratory judgment will serve no useful purpose," the district court may dismiss. *Id.* at 288.

The Fourth Circuit has fleshed out the general principles set forth in *Wilton* with specific considerations that guide district courts in deciding whether to entertain a declaratory judgment claim. Specifically, the Fourth Circuit has long held that "a district court is obliged to rule on the merits of a declaratory judgment action [only] when declaratory relief 'will serve a useful purpose in clarifying and settling the legal relations in issue' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). Indeed, "when neither of these results can be accomplished, the court should decline to render the declaration prayed." *Quarles*, 92 F.2d at 325 (quoting Edwin Borchard, *Declaratory Judgments* 107–09 (1st ed. 1934)). Importantly, a declaration of rights can serve no useful purpose if "more effective relief can and should be obtained by another procedure." Edwin Borchard, *Declaratory Judgments* 303 (2d ed. 1941) (em-

18

phasis removed).[13] For that reason, the Fourth Circuit recognizes that it is "well settled that the declaratory remedy should not be invoked merely to … determine the validity of defenses in pending cases." *Quarles*, 92 F.2d at 325;[14] *see also* Borchard, *op. cit.*, at 303 n.57 (collecting cases). It is therefore inappropriate to entertain a counterclaim for a declaratory judgment that is, in substance, an improperly pleaded affirmative defense.

This guidance, applied here, clearly indicates that JACS' declaratory judgment counterclaim should be dismissed. The only "useful purpose" JACS' declaratory judgment could serve would be to establish that JACS is not liable on ViaPath's contract claims because the MSA's exclusive dealing provision is void for illegality. *Volvo Construction*, 386 F.3d at 594. Identical relief could be obtained more effectively by litigating the issue as an affirmative defense. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81–82 (1982) (illegality under the Sherman Act can be raised as an affirmative defense to liability on a contract). Likewise, the only "uncertainty, insecurity, and controversy" that could be settled by issuing such a declaratory judgment would be the uncertainty that led to the filing of this very case—uncertainty that will be resolved once ViaPath's contract claims are adjudicated. *Volvo Construction*, 386 F.3d at 594. Because JACS' claim for declaratory relief is improperly asserted, discretion is best exercised to dismiss the claim.

---

13 Courts in this District consistently apply this principle by dismissing declaratory judgment actions that are brought "where … claims and rights asserted have fully matured, and the alleged wrongs have already been suffered." *Avepoint, Inc. v. Knickerbocker*, 475 F. Supp. 3d 483, 488 (E.D. Va. 2020) (internal quotation omitted) (collecting cases); *see also Tapia v. U.S. Bank N.A.*, 718 F. Supp. 2d 689, 695 (E.D. Va. 2010) (same).

14 One of the cases that *Quarles* cited for this proposition—*Slowmach Realty Corp. v. Leopold*, 258 N.Y.S. 500 (App. Div. 1932)—is especially apt here. In *Slowmach*, the New York appellate court dismissed as "baseless in form" a counterclaim for a declaratory judgment that requested, in substance, a declaration that a particular affirmative defense "ha[d] been established." *Slowmach*, 258 N.Y.S. at 503, *cited by Quarles*, 92 F.2d at 325. For the same reason, JACS' declaratory claim should be dismissed here.

## IV.

ViaPath's motion next argues that JACS' state-law tortious interference (Count VI), common law conspiracy (Count VIII), and statutory business conspiracy (Count X) claims against ViaPath should be dismissed for failure to allege plausibly various elements of those torts.[15] For the reasons below, ViaPath's motion must be denied with respect to JACS' tortious interference claim, but granted with respect to JACS' conspiracy claims.

### A.

In Virginia, tortious interference with contractual relations requires (i) a contract; (ii) knowledge of the contract; (iii) intentional interference with the contract causing a breach; and (iv) resulting damage. *See Collelo v. Geographic Servs., Inc.*, 727 S.E.2d 55, 62–63 (Va. 2012). The "intentional interference" element of the tort does not require that a defendant "acts for the primary purpose of interfering with the performance of the contract." *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 670 S.E.2d 704, 707 (Va. 2009) (quoting Restatement (Second) of Torts § 766 cmt. j (Am. Law Inst. 1979)). Instead, it is enough if a defendant "does not act for the purpose of interfering with the contract … but knows that the interference is certain or substantially certain to occur as a result." *Id.*

JACS argues that it has stated a claim for tortious interference because it alleges that, in the course of the ViaPath-Chhay Venture, ViaPath caused Chhay to breach his NDA by disclosing JACS' confidential information. ViaPath, in its motion to dismiss, argues that JACS has not

---

15 After oral argument on November 17, the parties were directed to submit supplemental briefing on the questions of antitrust injury and choice of law. *See Glob. Tel\*Link Corp. v. JACS Sols. Inc.* (order dated Nov. 17, 2023) (Dkt. 168). The parties' supplemental memoranda agree that, for purposes of this motion, Virginia's substantive law should govern JACS' state-law counterclaims. (*See* Dkts. 204, 205). Because the parties agree on choice of law, there is no need to address whether, as JACS argues, ViaPath waived any objection to the application of Virginia law. *See* JACS Suppl. Mem. at 6.

alleged plausibly the third element of the tort, *i.e.*, that ViaPath intentionally interfered with Rattana Chhay's NDA by inducing Chhay to breach his obligations. *See* AC ¶ 169; ViaPath Mem. at 15. ViaPath also argues JACS did not plausibly allege the fourth element, resultant damages. ViaPath Mem. at 16. Neither of ViaPath's arguments is convincing.

To begin with, JACS plausibly pleads the third element—intentional interference—because, as JACS correctly argues, that element is satisfied if ViaPath knew that its actions were certain or substantially certain to result in Chhay's breach of his contractual obligations. JACS Mem. at 16; *see DurretteBradshaw*, 670 S.E.2d at 707. JACS' amended counterclaims plead that NDAs are common in the tablet manufacturing industry, AC ¶ 164; that Chhay was required to notify ViaPath of the existence of the NDA; and that ViaPath and Chhay had begun secret development of a tablet to replace JACS' tablet as early as June 2022, AC ¶ 46(a). From this, it is reasonable to infer that ViaPath knew about Chhay's NDA or, at least, reasonably should have expected Chhay to have one; that ViaPath, despite this (real or constructive) knowledge partnered with Chhay to develop a tablet substantially like JACS' products; and that ViaPath knew or should have known that this secret project would induce Chhay to misappropriate JACS' trade secrets and violate his NDA. Thus, JACS has plausibly pled that ViaPath's intentional recruitment of Chhay satisfies the "intentional interference" element.

Next, JACS' pleaded facts plausibly establish the fourth element of the tort, namely, "resultant damage." *Collelo*, 727 S.E.2d at 63. JACS specifically pleads that ViaPath's conduct (i) deprived JACS of a $23 million license on its intellectual property and (ii) caused ViaPath to order fewer JACS tablets, in anticipation that Chhay's activities would soon replace ViaPath's need for JACS. AC ¶ 174. ViaPath objects that JACS' allegations are insufficient due to "a lack of specificity in alleging a resulting injury." ViaPath Mem. at 18. But JACS is not required to

state its allegations with specificity. *See* Fed. R. Civ. P. 9(b) (requiring "particularity" only "[i]n

alleging fraud or mistake"). To state a claim for tortious interference, JACS need only plausibly

plead that it suffered *some* damage, no matter how slight. If ViaPath indeed partnered with

Chhay to develop a tablet computer incorporating JACS' trade secrets sometime before June

2022, AC ¶ 51, and if ViaPath's purchase orders from JACS drastically slowed in early 2022,

very near in time to Chhay's departure from JACS, *id.* at ¶ 58, then it is plausible to conclude—

at a minimum—that ViaPath would have ordered more tablets from JACS absent ViaPath's tor-

tious collusion with Chhay. JACS has therefore plausibly pled damages, and with it, tortious in-

terference with contract.

## B.

ViaPath next argues for dismissal of Count VIII, JACS' common law conspiracy claim.

ViaPath argues that JACS fails to plead three elements of the tort: "the requisite concert of ac-

tion," "the underlying tort," and "the alleged injury." ViaPath Mem. at 19. Because JACS does

not respond to ViaPath's argument that JACS failed to plead an underlying tort, JACS' common

law conspiracy claim must be dismissed.

In Virginia, the tort of common law conspiracy is sufficiently pled if the plaintiff alleges

that "two or more persons combined to accomplish ... some lawful purpose by a criminal or un-

lawful means." *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va.

1995). Accordingly, Virginia common law "recognizes a cause of action against those who con-

spire to induce the breach of a contract, even when one of the alleged conspirators is a party to

the contract." *CaterCorp, Inc. v. Catering Concepts, Inc.*, 431 S.E.2d 277, 281 (Va. 1993). JACS,

in Count VIII of its counterclaims, alleges that "Chhay tort[i]ously interfered with the MSA" and

that "ViaPath conspired with Chhay to commit this tortious interference." AC ¶ 189. Specifically,

JACS alleges that Chhay tortiously interfered with the MSA by "intentionally induc[ing] ViaPath to violate provisions and covenants in the MSA" because, for example, "Chhay knew that … the work between ViaPath and Chhay using JACS proprietary information directly violated the MSA." *Id.* at ¶¶ 181–82; *see* MSA § 12.1 (confidentiality).

ViaPath argues that JACS "does no more than provide a legal conclusion that Chhay induced ViaPath to violate the provisions of MSA." ViaPath Mem. at 20–21. But, in response, JACS' opposition brief defends the wrong claim. Instead of arguing that *Chhay* knew of the *MSA*, consistent with JACS' allegations in Count VIII, JACS argues that ViaPath knew of Chhay's NDA and Separation Agreement. JACS Mem. at 24–25; *see* AC ¶ 192 (alleging that "Chhay conspired with ViaPath to tort[i]ously interfere with the Chhay NDA" as part of Count IX). Because JACS' briefing does not defend the claim that JACS itself pled, JACS "fails to counter" ViaPath's argument. *Williams v. Newport News Sch. Bd.*, No. 4:20-CV-41, 2021 WL 3674983, at *17 (E.D. Va. Aug. 19, 2021). Thus, ViaPath's argument is appropriately treated "as conceded," and JACS' common-law conspiracy claim must be dismissed. *Id.*[16]

## C.

Virginia's business conspiracy act requires a plaintiff to prove that "two or more persons … combine[d] … for the purpose of … willfully and maliciously injuring [the plaintiff] in [the plaintiff's] reputation, trade, business or profession." Va. Code §§ 18.2-499(A). To prevail on such a claim, a plaintiff "must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification." *N. Va. Real Estate, Inc. v. Martins*, 720 S.E.2d 121, 133 (Va. 2012) (quoting

---

16 *See also Ruddy v. Bluestream Prof'l Serv., LLC*, 444 F. Supp. 3d 697, 714 n.34 (E.D. Va. 2020) (same); *Ameur v. Gates*, 950 F. Supp. 2d 905, 918 n.4 (E.D. Va. 2013) (same); *Cureton v. U.S. Marshal Serv.*, 322 F. Supp. 2d 23, 27 (D.D.C. 2004) (same).

*Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003)). The VBCA "do[es] not ... require proof that a conspirator's primary and overriding purpose is to injure another in his trade or business." *Bellsouth*, 453 S.E.2d at 267. Nevertheless, a VBCA plaintiff must plead "that such a purpose was at least *one* of the purposes of the conspiracy." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 326 (W.D. Va. 2007) (emphasis in original) (citing *Simmons v. Miller*, 544 S.E.2d 666, 676–77 (Va. 2001)).[17]

JACS' VBCA claim fails because JACS has not plausibly alleged that ViaPath and Chhay acted with a specific intent to harm JACS. The only allegation in the counterclaim that ViaPath and Chhay acted with the requisite legal malice—*i.e.*, that ViaPath and Chhay acted intentionally and purposefully to harm JACS' business—is that "ViaPath and Chhay [acted] intentionally, purposefully, and without lawful justification." AC ¶ 199. This paragraph merely restates the relevant legal standard; in other words, the paragraph is "no more than conclus[ory]" and accordingly is "not entitled to the presumption of truth." *Iqbal*, 556 U.S. at 679. Although ViaPath and Chhay's agreement may have ultimately harmed JACS in its business, JACS' amended counterclaims nowhere plead facts to support an inference that ViaPath and Chhay formed an agreement *to harm JACS* rather than simply to make money. Count X of JACS' counterclaims—its VBCA claim—must therefore be dismissed.

### V.

In summary, Count I of JACS' counterclaims must be dismissed in full. Although ViaPath's affirmative defense of *in pari delicto* cannot be resolved on a motion to dismiss, JACS' Clayton Act claims for treble damages and an injunction nonetheless fail for lack of antitrust in-

---

17 This requirement is well supported by controlling caselaw. *See, e.g., N. Va. Real Estate*, 720 S.E.2d at 133 ("agreement to harm the plaintiffs"); *Greenspan v. Osheroff*, 351 S.E.2d 28, 35 (Va. 1986) ("specific intent," *i.e.*, "intent to harm the victim"); *Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013) ("evidence of improper motive").

jury. In addition, JACS' counterclaim for a declaratory judgment will be dismissed because that claim is more properly brought, if at all, as an affirmative defense to contract liability.

Further, JACS' tortious interference claim must be sustained, but JACS' conspiracy claims must be dismissed. Tortious interference requires only knowledge that interference with contract is substantially likely to occur, and such knowledge on ViaPath's part is plausibly inferred from JACS' pleadings. But JACS fails to challenge ViaPath's argument that JACS did not adequately plead the tort underlying JACS' common law conspiracy claim, *i.e.*, Chhay's tortious interference with ViaPath's performance of the MSA. That claim is therefore conceded. Finally, Virginia's business conspiracy statute required JACS to plead a specific intent to cause harm to JACS rather than a mere expectation of such a result. This JACS has not pled. Thus, one of JACS' state tort claims survives, but the other two claims do not.

In conclusion, Counts I, VIII, and X of JACS' Amended Counterclaims will be dismissed. An appropriate Order will issue. The Clerk is directed to provide a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
December 27, 2023

T.S. Ellis, III
Senior United States District Judge